23CA0781 Mordhorst Cleaning v Cardamone 09-12-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0781
City and County of Denver District Court No. 22CV305
Honorable Stephanie L. Scoville, Judge

Mordhorst Cleaning, LLC, d/b/a Blue Ribbon Exteriors and Construction,

Plaintiff-Appellee,

v.

Geoff Cardamone and Katie Cardamone,

Defendants-Appellants.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE SCHOCK
Fox and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 12, 2024

Allen & Curry P.C., Theodore A. Wells, Denver, Colorado, for Plaintiff-Appellee

The Arriola Law Firm, LLC, Erick S. Arriola, Englewood, Colorado, for Defendants-Appellants

¶ 1    Defendants, Geoff Cardamone and Katie Cardamone (the Cardamones), appeal the judgment entered for them and against plaintiff, Mordhorst Cleaning, LLC, d/b/a Blue Ribbon Exteriors and Construction (Blue Ribbon), following a bench trial.  We affirm.

## I.    Background

¶ 2    Months after the Cardamones moved into their new home, the fire suppression system froze and a pipe burst, causing extensive water damage.  The Cardamones filed an insurance claim and hired a public adjuster to assist them with the insurance claim process.

¶ 3    The Cardamones hired Blue Ribbon to serve as the general contractor for the repairs.  The parties entered into one contract for the repair of the fire suppression system and another for the repair of the damage caused by the burst pipe.  Neither contract included a price for the work.  Instead, the contracts provided that "materials and specialty trade contractors shall be billed at cost plus twenty percent . . . subject to change without notice," and the general contractor "shall be entitled to 10% overhead and 10% of the amounts due and owing for repairs completed."  The parties entered into additional agreements for other work not covered by insurance.

¶ 4     The public adjuster made several payments to Blue Ribbon out of the insurance proceeds.  But the Cardamones did not have sufficient insurance coverage to pay the full cost of the repair and restoration.  So several months into the project, they requested detailed information from Blue Ribbon about the remaining costs.  The owner and managing partner of Blue Ribbon, Ryan Mordhorst, refused to provide the information, deeming it an unreasonable request.  Ten days later, Blue Ribbon stopped work on the project, though the parties dispute who terminated the relationship.

¶ 5     Blue Ribbon sent the Cardamones a final invoice for $13,940.54, which the Cardamones did not pay.

¶ 6     Blue Ribbon then sued the Cardamones for the unpaid invoice.  The Cardamones asserted counterclaims for breach of contract, civil theft, and unjust enrichment.  They alleged that Blue Ribbon had (1) failed to complete the work required by the parties' contracts; (2) failed to pay subcontractors and material suppliers, in violation of section 38-22-127, C.R.S. 2024; and (3) retained money for work it did not perform and materials it did not deliver.

¶ 7    After a two-day bench trial, the district court found in favor of Blue Ribbon on some issues and in favor of the Cardamones on others.  Four of those rulings are at issue in this appeal:

(1)    The district court ruled against the Cardamones on their claim for civil theft, finding that they failed to prove Blue Ribbon received funds for the payment of any subcontractor that it failed to pay, or that it acted with the requisite state of mind in doing so.

(2)    The court rejected the Cardamones' claim of unjust enrichment related to Blue Ribbon's markup for cabinets because the Cardamones agreed to the price for the cabinets in separate contracts.

(3)    The court rejected the Cardamones' claim of unjust enrichment for payments relating to the handling of their personal property, finding that they had suffered no losses that were not covered by insurance and that Blue Ribbon had acted as a middleman for this work.

(4)    The court found that the Cardamones were liable for $5,653.99 for additional framing work.  The court noted that this amount was not included in Blue Ribbon's

3

original complaint, but it concluded that the issue was tried by consent because Blue Ribbon presented evidence on this point at trial and the Cardamones did not object.

¶ 8 After awarding prejudgment interest and offsetting the amounts awarded to each party, the court entered judgment in favor of the Cardamones in the total amount of $8,768.74.

## II.   The Cardamones' Claims

¶ 9 The Cardamones contend that the district court erred by denying their claims for (1) civil theft; (2) excess cabinet markup; and (3) Blue Ribbon's retention of funds for personal property services.

### A.   Standard of Review

¶ 10 Our review of a judgment following a bench trial presents a mixed question of fact and law. *State ex rel. Weiser v. Ctr. for Excellence in Higher Educ., Inc.*, 2023 CO 23, ¶ 33. We review the district court's factual findings for an abuse of discretion and its legal conclusions de novo. *Id.* In doing so, we defer to the district court's credibility findings and its assessment of the weight and probative effect of the evidence. *Amos v. Aspen Alps 123, LLC*, 2012 CO 46, ¶ 25; *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 521 (Colo.

App. 2011). It is not our role to decide the facts or substitute our judgment for that of the district court, and we will not disturb the district court's findings of fact "unless they are so clearly erroneous as to find no support in the record." *Saturn Sys.*, 252 P.3d at 521.

## B.    Civil Theft

¶ 11    The Cardamones contend that the district court erred in applying section 38-22-127 to their civil theft claim arising out of payments owed to three subcontractors: Ridge Construction (Ridge), The Contents Company (TCC), and Electronic Restoration Services (ERS). They assert that Blue Ribbon received payments intended for these subcontractors but intentionally failed to fully pay them. Because the Cardamones have not shown that the district court's findings to the contrary are clearly erroneous, we affirm its ruling.

### 1.    Additional Background

¶ 12    Blue Ribbon subcontracted with Ridge to obtain the framing permit for the project. Ridge submitted the permits and invoiced Blue Ribbon for the permitting fees. Blue Ribbon did not pay the invoice, but it included the permitting fees in its final invoice to the Cardamones. The Cardamones did not pay that invoice, and the

district court found that Blue Ribbon had not been compensated for the permit by the public adjuster or the Cardamones.

¶ 13   The Cardamones contracted directly with TCC and ERS for services related to their personal property insurance claim, including inventorying, packing, cleaning, storing, and redelivering their personal property.  Although Blue Ribbon did not contract with either TCC or ERS, it served as an intermediary between those companies and the Cardamones.  TCC and ERS submitted invoices to Blue Ribbon, which passed them on to the public adjuster.  The public adjuster then paid Blue Ribbon, and Blue Ribbon paid TCC and ERS after taking out a charge for its own overhead and profit.

¶ 14   Blue Ribbon paid TCC more than $40,000 and ERS more than $8,000.  But after Blue Ribbon stopped working on the project, both companies billed the Cardamones additional amounts.  Blue Ribbon eventually paid TCC in full.  Although the Cardamones asserted that they paid a final past due invoice to ERS, the district court found the evidence was insufficient to prove that they did so.

### 2.   Analysis

¶ 15   Colorado's construction trust fund statute, section 38-22-127(1), provides:

6

> All funds disbursed to any contractor . . . under any . . . construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors . . . who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.

A violation of this subsection constitutes theft, as defined in section 18-4-401, C.R.S. 2024. § 38-22-127(5); *see also* § 18-4-405, C.R.S. 2024 (providing for civil action to recover treble damages for theft).

¶ 16    Colorado courts have construed theft under section 38-22-127(5) to incorporate the culpable mental states in section 18-4-401(1). *See People v. Anderson*, 773 P.2d 542, 544 (Colo. 1989); *see also Franklin Drilling & Blasting, Inc. v. Lawrence Constr. Co.*, 2018 COA 59, ¶ 18 (holding that a plaintiff must prove a culpable mental state to prove civil theft under similar Public Work Trust Fund statute, section 38-26-109, C.R.S. 2024). One such culpable mental state is that the defendant "[k]nowingly uses . . . the thing of value in such manner as to deprive the other person permanently of its use or benefit." § 18-4-401(1)(b). This means the defendant must "be aware that his manner of using the trust funds is

practically certain to result in depriving another person of the use or benefit of the funds." *Anderson*, 773 P.2d at 545.

¶ 17    The district court found that the Cardamones did not prove Blue Ribbon failed to pay Ridge, TCC, or ERS any amounts for which it received payment from the Cardamones. As to Ridge, the court found that Blue Ribbon did not receive payment from the Cardamones for the permits. As to TCC, the court found that it was paid in full. And as to ERS, the court found that the Cardamones failed to prove that they were required to pay an additional invoice. The court also found that there was no evidence that Blue Ribbon held any additional funds in trust for payment of ERS.

¶ 18    The Cardamones do not point to anything in the record that refutes these findings. Instead, they argue more generally that because Blue Ribbon received *total* funds that exceeded the amounts due, it was required to pay all outstanding amounts before taking any profit. But section 38-22-127(1) does not require a contractor to hold *all funds* it receives on a project in trust until all subcontractors have been paid. It requires the contractor to hold funds in trust for the payment of subcontractors "for which such disbursement was made." § 38-22-127(1). In other words, a

contractor must pay a subcontractor all amounts for which the contractor itself has received payment. The Cardamones do not identify any evidence that they made payments to Blue Ribbon for the purpose of paying Ridge for permits or paying TCC or ERS for the amounts billed *after* Blue Ribbon stopped work on the project.

¶ 19 The Cardamones cite Mordhorst's testimony that Blue Ribbon received more money *for framing related work* than it paid Ridge. That testimony does not show that Blue Ribbon received any funds *for the permits*. To the contrary, Mordhorst testified that the Cardamones refused to pay anything for the permits. And the "permits" line item on the final invoice — which the district court found the Cardamones had not paid — supports that conclusion. Similarly, the fact that Blue Ribbon received payments for *other* amounts billed by TCC and ERS does not show that it received payment for the amounts that were billed several months later.

¶ 20 The district court also found that Blue Ribbon did not act with the requisite state of mind to commit civil theft with respect to either the permitting fees or the personal property claims. *See*

*Anderson*, 773 P.2d at 544. That finding is not clearly erroneous.[1]

Mordhorst's testimony that he received more money for framing related work than he paid Ridge does not establish that Blue Ribbon was aware that its conduct was "practically certain" to deprive the Cardamones of the use of funds intended for the payment of permits. *See id.* Nor does Mordhorst's retention of overhead and profit on earlier invoices from TCC and ERS establish that Blue Ribbon knowingly deprived the Cardamones of the use of funds intended for the payment of *other* personal property invoices. That is particularly true given the nature of the parties' ongoing disputes. *See* § 38-22-127(2) (providing that a contractor need not hold funds in trust if the contractor "has a good faith belief that such . . . claim is not valid or . . . , in good faith, claims a setoff").

¶ 21     Finally, to the extent the Cardamones contend that Blue Ribbon violated section 38-22-127(3) by failing to maintain adequate records of account for the project, such a violation — even

---

[1] The Cardamones assert that the interpretation and application of section 38-22-127, C.R.S. 2024, is a question of law that we review de novo. But they have not identified any legal error in the district court's application of the statute. Their disagreement with the court's factual findings does not mean the court misapplied the law.

if proved — would not prove their theft claim. *See* § 38-22-127(5) (limiting "theft" to a violation of subsections (1) and (2)).

¶ 22     Thus, the district court did not clearly err in finding that Blue Ribbon did not receive funds for the payment of Ridge, TCC, or ERS that it failed to pay to those entities. In light of that finding, the district court correctly denied the Cardamones' civil theft claim.

## C.     Cabinet Claim

¶ 23     The Cardamones next argue that the district court erred by denying their claim for unjust enrichment based on Blue Ribbon's markup for the cabinets, which exceeded the twenty percent markup in the parties' primary contracts. We are not persuaded.

### 1.     Additional Background

¶ 24     The Cardamones selected and ordered custom cabinetry through the Flooring Group. Because the Flooring Group is a wholesaler, it did not invoice the Cardamones directly. Instead, it invoiced Blue Ribbon, which then invoiced the Cardamones. The Flooring Group charged Blue Ribbon $22,347.17 for the kitchen cabinets and $4,821.13 for the bathroom vanities. Blue Ribbon charged the Cardamones $39,757.19 and $7,556.76, respectively.

11

¶ 25    Mr. Cardamone signed separate contracts with Blue Ribbon for the cabinets and vanities.  Mr. Cardamone testified at trial that he was concerned that the price of the cabinetry was excessive, but he felt pressure to agree to it due to time constraints.  He signed the agreement after Mordhorst told him "[t]he price is the price."  The cabinets were delivered damaged and the wrong color.  But by that time, Blue Ribbon had stopped working on the project, and it refused to work with the Flooring Group to correct the issues.

¶ 26    In their post-trial brief, the Cardamones asserted that Blue Ribbon had been unjustly enriched to the extent its markup exceeded the standard twenty percent markup in the parties' primary contracts.  The district court rejected the claim because the cabinets were covered by separate contracts confirming the price.

## 2.    Analysis

¶ 27    Unjust enrichment is "a quasi-contractual, equitable remedy designed to undo a benefit conferred on one party at the unfair expense of another party."  *Pulte Home Corp. v. Countryside Cmty. Ass'n*, 2016 CO 64, ¶ 63.  It "seeks to restore fairness . . . when the plaintiff has no alternative right under an enforceable contract."  *Alderman v. Bd. of Governors of Colo. State Univ.*, 2023 COA 61,

12

¶¶ 22-23 (*cert. granted* May 6, 2024). But "[a] party generally cannot recover for unjust enrichment . . . where there is an express contract addressing the subject of the alleged obligation to pay." *Pulte Home Corp.,* ¶ 64.

¶ 28    The record supports the district court's finding that the Cardamones and Blue Ribbon entered into separate contracts for the cabinetry that set its price. Mordhorst testified that the parties entered into one contract for the kitchen cabinets and one for the bathroom vanities, both of which stated the price the Cardamones owed. He also testified that the Cardamones had an opportunity to ask questions about the price before they signed the contracts. Mr. Cardamone similarly testified as to these separate agreements. And although he thought the price was high and felt pressured to sign the agreements, he acknowledged that he signed them voluntarily.

¶ 29    The Cardamones assert that the district court's finding that the cabinets and vanities were subject to separate agreements "does not comport [with] the evidence presented." But they don't explain why, particularly in light of the testimony above. They do not cite anything in the record to support their assertion that the cabinets were included in the primary rebuild contract and, thus, limited to

a twenty-percent markup. *See* C.A.R. 28(a)(7)(B) (requiring appellant to cite "the authorities and parts of the record on which the appellant relies"); *Brighton Sch. Dist. 27J v. Transamerica Premier Ins. Co.*, 923 P.2d 328, 335 (Colo. App. 1996) ("[I]t is not the duty of the reviewing court to search the record for evidence to support bald assertions."), *aff'd*, 940 P.2d 348 (Colo. 1997). And even if they were, the Cardamones do not explain why the parties could not later separately agree on the price for those cabinets.

¶ 30    The Cardamones also hint at several factual challenges to the cabinet contracts and Blue Ribbon's performance, including that the markups were "beyond excessive," that Blue Ribbon delayed payment to the cabinet supplier, and that Blue Ribbon did not assist in resolving the incorrect delivery. But none of these arguments negate the district court's finding that enforceable contracts existed. And although the Cardamones assert that they were "under duress of timing and financial pressures," they do not dispute Mr. Cardamone's concession that he signed the contracts voluntarily. Having agreed to the prices for the cabinets, the Cardamones could not claim Blue Ribbon was unjustly enriched.

### D. Personal Property Claim

¶ 31    The Cardamones also assert that the district court erred by denying their unjust enrichment claim related to Blue Ribbon's retention of funds for serving as the middleman between the Cardamones and the companies handling the personal property claim. They contend that Blue Ribbon was not entitled to retain any portion of such funds because their contract with Blue Ribbon did not cover the personal property portion of the claim and the Cardamones were not aware that Blue Ribbon was involved.

¶ 32    To prevail on an unjust enrichment claim, a plaintiff must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation. *Pulte Home Corp.*, ¶ 63. When the parties have an express contract, a party may still recover for unjust enrichment for matters outside of the contract. *Id.* at ¶ 64. We review the district court's ruling on an unjust enrichment claim for an abuse of discretion. *Lewis v. Lewis*, 189 P.3d 1134, 1140 (Colo. 2008).

¶ 33    The district court agreed with the Cardamones that no contract covered Blue Ribbon's handling of the Cardamones'

15

personal property claim. But it found that the Cardamones did not prove the second and third elements of their claim because (1) they did not show that their personal property expenses were not fully covered by insurance; and (2) the public adjuster, who acted as the Cardamones' agent, knew Blue Ribbon was serving in that role.

¶ 34 The Cardamones do not meaningfully challenge either of these findings. Although they assert that they were "left to cover a portion of [TCC's and ERS's] bills," they do not cite any record support for that assertion, and the district court found otherwise. C.A.R. 28(a)(7)(B); *see also Makeen v. Hailey*, 2015 COA 181, ¶ 49 ("[W]e will not comb the record in search of additional facts to support this claim."). Beyond that, the Cardamones highlight facts (again without record citation) that were either undisputed or immaterial to the court's resolution of their claim — namely, that they contracted directly with TCC and ERS and that they did not agree to Blue Ribbon's involvement. Neither of these facts refutes the district court's determination that there was no unjust enrichment where the Cardamones' *agent* knew what was going on the entire time and approved of Blue Ribbon's participation.

¶ 35    We therefore conclude that the district court did not abuse its discretion by denying the Cardamones' claim for unjust enrichment related to Blue Ribbon's handling of the personal property claim.

### III.    Noninsurance Framing Cost

¶ 36    The Cardamones also contend that the district court erred by awarding Blue Ribbon the unpaid amount for additional framing work that Blue Ribbon did not plead in its complaint.

### A.    Additional Background

¶ 37    In its complaint, Blue Ribbon alleged that it was owed the amount of its final invoice. Blue Ribbon's damage disclosure and the trial management order similarly stated that Blue Ribbon sought to recover as damages the amount of the final invoice.

¶ 38    At trial, Blue Ribbon's counsel asked Mordhorst about another category of damages that was not included in the final invoice. Specifically, Mordhorst testified that the Cardamones still owed Blue Ribbon $5,653.99 for framing changes that were not covered by insurance. He requested that this amount be awarded or credited to Blue Ribbon. The Cardamones' counsel did not object to this testimony, but on cross-examination, he introduced Blue Ribbon's damages disclosure as an exhibit to show that Mordhorst's

17

testimony was inconsistent with that disclosure. On cross-examination, Mr. Cardamone acknowledged that the Cardamones had not paid the full balance of the noninsurance framing invoice, but he said that it was because the framing was not completed.

¶ 39 The district court awarded Blue Ribbon the unpaid amount of that invoice. It recognized that the amount was not included in Blue Ribbon's complaint, but it concluded that the issue had been tried by consent because the Cardamones did not object.

### B. Applicable Law and Standard of Review

¶ 40 C.R.C.P. 54(c) provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in [its] pleadings." *See also Twp. Homeowners Ass'n v. Arapahoe Roofing & Sheet Metal Co.*, 844 P.2d 1316, 1318 (Colo. App. 1992) ("[T]he relief ultimately granted is governed not by the demand [in the complaint], but by the facts alleged, the issues, and the proof.").

¶ 41 Thus, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings," even if the pleadings are not amended. C.R.C.P. 15(b). A party who fails to

object to the introduction of evidence concerning such an issue is deemed to consent. *Bittle v. CAM-Colorado, LLC*, 2012 COA 93, ¶ 43. Under such circumstances, the district court "has the duty to consider [the] issue . . . even if the matter was not pled and no formal application was made to amend" the pleadings, so long as the issue was "intentionally and actually tried." *Id.* at ¶¶ 43-44.

¶ 42     We review the district court's decision to address an issue not raised in the pleadings for an abuse of discretion. *Id.* at ¶ 41.

### C.     Analysis

¶ 43     We conclude that the district court did not abuse its discretion by awarding Blue Ribbon the unpaid amount of the noninsurance framing costs for three reasons.

¶ 44     First, the issue was "intentionally and actually tried." *Id.* at ¶ 44. Not only did Mordhorst testify that Blue Ribbon was owed this amount, but he explicitly requested that it be awarded to Blue Ribbon as part of the judgment in the case. Blue Ribbon's counsel also cross-examined Mr. Cardamone about the remaining balance. Then, in Blue Ribbon's proposed findings of fact after trial, which the district court ordered in lieu of closing argument, Blue Ribbon requested that the court award it that amount. Thus, Blue Ribbon

did more than merely present "some evidence . . . germane to the issue." *Id.* (citation omitted).  It put the Cardamones on notice that Blue Ribbon was seeking to recover that amount.

¶ 45    Second, the Cardamones did not object to Mordhorst's testimony.  *See id.* at ¶ 43 ("[C]onsent is generally found when evidence is introduced without objection . . . .") (citation omitted).  Although their counsel later introduced Blue Ribbon's damage disclosure to show that Mordhorst's testimony was inconsistent with it, he did not argue that Blue Ribbon was precluded from seeking the additional amount.  Nor did he object to Blue Ribbon's cross-examination of Mr. Cardamone on the same point.

¶ 46    Third, even if the Cardamones did not consent to try the issue, they have not shown that they were prejudiced.  *See Davis v. GuideOne Mut. Ins. Co.*, 2012 COA 70M, ¶ 73.  Prejudice in this context means "a lack of opportunity to prepare to meet the unpleaded issue." *Id.* at ¶ 74 (citation omitted).  As the district court noted, there was no dispute that Blue Ribbon had billed the Cardamones for this amount and the Cardamones had not paid it.  To the extent the Cardamones assert that they did not pay the

20

balance because "the framing wasn't completed," they had ample opportunity to litigate that issue as part of their counterclaim.

¶ 47 The district court therefore did not abuse its discretion in considering this unpleaded issue under C.R.C.P. 15(b).[2]

## IV. Disposition

¶ 48 The judgment is affirmed.

JUDGE FOX and JUDGE JOHNSON concur.

---

[2] The Cardamones' reference to the district court's denial of their pretrial motion to amend their counterclaims to add additional parties is a non sequitur. That motion — which Blue Ribbon opposed — has nothing to do with whether the unpaid framing invoice issue was tried by the consent of the parties.